UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
ABDUL-GIYATH O. MAYALE-EKE,       :
               Plaintiff,         :
                                  :
     v.                           :      CA 10-29 S
                                  :
MERRILL LYNCH, PIERCE, FENNER     :
& SMITH, INC., d/b/a BANC OF      :
AMERICA INVESTMENT SERVICES,      :
INC., and JASON MISIANO,          :
               Defendants.        :
```

**REPORT AND RECOMMENDATION**

David L. Martin, United States Magistrate Judge

Before the Court is Defendants' Motion to Dismiss Plaintiff's Amended Complaint and Request for Hearing (Docket ("Dkt.") #8) ("Motion to Dismiss" or "Motion") for failure to state a claim upon which relief may be granted.  The Motion has been referred to me for preliminary review, findings, and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B). After reviewing the filings, listening to oral argument, and performing independent research, I recommend that the Motion be granted in part and denied in part.

**I.  Facts**

Plaintiff Abdul-Giyath O. Mayale-Eke ("Plaintiff" or "Mayale-Eke") is a resident of Providence, Rhode Island.  Amended

Complaint (Dkt. #5) ¶ 1.[1]  He was born in Nigeria and is of African descent.  Id. ¶ 2.  His skin is dark brown.  Id.  Mayale-Eke immigrated to the United States in 2001 and became an American citizen in 2007.  Id.

Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), is a Delaware corporation with headquarters in Charlotte, North Carolina.  Id. ¶ 5.  It is in the business of investment counseling and management.  Id. ¶ 8.  Merrill Lynch was acquired by Bank of America Corporation ("Bank of America") in 2009 and is now a wholly-owned subsidiary of Bank of America. Id. ¶ 5.

In 2007, Merrill Lynch interviewed Mayale-Eke for employment as an investment specialist at its Lincoln, Rhode Island, location.  Id. ¶ 9.  At that time, Plaintiff had already become a registered representative by passing the general securities representative exam, a prerequisite for being an investment specialist at Merrill Lynch.  Id. ¶ 10.  Plaintiff was hired by Merrill Lynch on October 1, 2007, and his duties were to provide customer service, answer questions, and place customers' investment orders by phone.  Id. ¶ 11.  Mayale-Eke successfully completed a two week training program and thereafter passed the

---

[1] The paragraphs of Plaintiff's Amended Complaint (Dkt. #5) are numbered 1 to 9 followed by paragraphs 1 to 59.  Such numbering is confusing and should be avoided.  As renumbering the paragraphs would create even more confusion, the Court notes the anomaly and uses Plaintiff's numbering in citing to the Amended Complaint.

licensing exam to become a securities agent.  Id. ¶¶ 12-14.
Jason Misiano ("Misiano"), a Caucasian Merrill Lynch employee,
was one of Plaintiff's supervisors.  Id. ¶ 9.  Both Merrill Lynch
and Misiano (collectively "Defendants") knew Plaintiff's race,
color, place of birth, and religion.  Id. ¶ 3.

Plaintiff began taking customer calls.  Id. ¶ 15.  Due to
his accent, some customers asked him where he was born, if he was
Muslim, or what he thought of Osama Bin Laden and terrorists.
Id. ¶¶ 15-18.  Additionally, some customers expressed dislike for
Muslims or asked to be transferred to someone who spoke "American
English."  Id. ¶¶ 19-20.  Some customers also complained to
Merrill Lynch about Mayale-Eke.  Id. ¶ 21.  All calls between
Mayale-Eke and Merrill Lynch customers were recorded, and some
were monitored by supervisors and/or quality assurance ("QA")
evaluators.  Id. ¶ 22.

On April 29, 2008, within several weeks of customers'
complaints to Merrill Lynch, Plaintiff received a written warning
("First Written Warning") that his performance was not meeting
expectations.  Id. ¶ 23.  The First Warning was issued by Joseph
Kelly ("Kelly"), Plaintiff's immediate supervisor who reported
directly to Misiano.  Id. ¶ 24.  Merrill Lynch uses an objective
quality assurance score ("QA score") on a scale of zero to 100%
to grade the performance of its customer service agents, and the
First Written Warning noted that Mayale-Eke's QA score was 77.47%

3

for the first quarter of 2008.  Id. ¶¶ 26-27.  According to the Merrill Lynch handbook governing Plaintiff's employment (the "Handbook"), investment specialists who receive a QA score of 70% or greater are eligible to participate in the company's incentive system, and specialists who receive a QA score of 75% or greater receive a bonus.  Id. ¶¶ 28-29.  Mayale-Eke's QA score of 77.47% made him eligible for a bonus.  Id. ¶ 29.  After the First Written Warning, Plaintiff was informed that he received a bonus for his performance in the first quarter of 2008, the first quarter he was eligible for a bonus.  Id. ¶¶ 29-30.  In Plaintiff's First Written Warning, Kelly wrote that Mayale-Eke had to "improve his Quality scores immediately, to be in line with the ... average of 87.49."  Id. ¶ 31 (alteration in original).  A requirement that specialists attain the average score for their team[2] does not appear in the Handbook, and it is inconsistent with the policy that investment specialists with a score of 70% participate in the incentive system and the provision that investment specialists with a 75% score or more get a bonus.  Id. ¶ 32.

Plaintiff was issued a second and final written warning ("Final Written Warning") by Kelly two weeks after receiving the First Written Warning.  Id. ¶ 33.  The Final Written Warning was

---

[2] The Amended Complaint does not explain who or what constituted Plaintiff's "team."  Amended Complaint ¶ 32.

temporally proximate to customers' inquiries regarding Plaintiff's country of origin and religion and customers' complaints about him.  Id. ¶ 34.  The Final Written Warning indicated that Mayale-Eke's QA score for April 2008 through May 2008 had increased by 13% to 82.54 since the first quarter of 2008, which, according to the Handbook, would entitle Plaintiff to a bonus.  Id. ¶¶ 36-37.  Kelly wrote in Mayale-Eke's Final Written Warning that Plaintiff was expected to improve his QA scores immediately to be in line with the average of 87.49.  Id. ¶ 37. Plaintiff's QA score of 82.45 was 4.95% less than this. Id.

Two weeks after the Final Written Warning, Misiano terminated Plaintiff.  Id. ¶ 38.  Misiano told Plaintiff that he was a "business risk" and was causing clients to take their business away from Merrill Lynch.  Id. ¶ 39.

## II.  Travel

On September 9, 2008, Plaintiff filed a charge of discrimination based on race, color, national origin, and religion with the Rhode Island Commission for Human Rights ("Commission"), which on December 31, 2009, issued him a right to sue letter.  Id. ¶¶ 7-8.  Plaintiff commenced the instant action on or about January 5, 2010.  See Notice of Removal, Exhibits ("Exs.") 1-2 (Complaint).  He filed his Amended Complaint on February 15, 2010.  See Amended Complaint.  Defendants filed the

instant Motion to Dismiss on March 1, 2010.  <u>See</u> Dkt.  The Court conducted a hearing on the Motion on April 14, 2010, and thereafter took the matter under advisement.

**III.  Law**

**A.  Rule 12(b)(6) Standard**

In 2007, the Supreme Court altered the Rule 12(b)(6) standard in a manner which gives it more heft.  <u>ACA Fin. Guar. Corp. v. Advest, Inc.</u>, 512 F.3d 46, 58 (1st Cir. 2008).  In order to survive a motion to dismiss a complaint must allege 'a plausible entitlement to relief."  <u>Id.</u> (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 559, 127 S.Ct. 1955 (2007)).  This pleading standard applies to all civil actions, including discrimination suits.  <u>Ashcroft v. Iqbal</u>, ___ U.S. ___, 129 S.Ct. 1937, 1953 (2009).

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  <u>Id.</u> at 1949 (quoting Rule 8(a)(2)).  The pleading standard Rule 8 announces does not require "detailed factual allegations," <u>id.</u>, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation, <u>id.</u> (citing <u>Twombly</u>, 550 U.S. at 555).  A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do."  <u>Id.</u> (citing <u>Twombly</u> at 555).  Nor does a complaint suffice if it tenders "naked

6

assertion[s]" devoid of "further factual enhancement."  Id. (citing Twombly at 557).

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."  Id. (citing Twombly at 570).  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  Id. (citing Twombly at 556).  The plausibility standard is not akin to a "probability requirement," id., but it asks for more than a sheer possibility that a defendant has acted unlawfully, id.  Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"  Id. (citing Twombly at 557).

In Iqbal, the Supreme Court explained that two working principles underlay its decision in Twombly.  Id.  First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Id.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.  Id. (citing Twombly at 555).  Although for the purposes of a motion to dismiss a court must take all of the factual allegations in the complaint as true, the court is "not bound to accept as true

7

a legal conclusion couched as a factual allegation." <u>Id.</u> at 1949-50.  While Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. <u>Id.</u> at 1950.  Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. <u>Id.</u> (citing <u>Twombly</u> at 556).  Determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. <u>Id.</u>  Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not "show[n]"-"that the pleader is entitled to relief." <u>Id.</u> (quoting Rule 8(a)(2)).

A court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. <u>Id.</u> While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. <u>Id.</u>  When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. <u>Id.</u>  The <u>Iqbal</u> court cited its analysis in <u>Twombly</u> as illustrating this "two-pronged approach." <u>Id.</u>

### B. Employment Discrimination

The Supreme Court held in Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508, 122 S.Ct. 992 (2002), that a complaint in an employment discrimination lawsuit does not have to contain specific facts establishing a prima facie case of discrimination under the framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 (1973).  Swierkiewicz appears to remain good law.  See Lindsay v. Yates, 498 F.3d 434, 440 (6th Cir. 2007)("Because the Supreme Court majority [in Twombly] distinguished Swierkiewicz and nowhere expressed an intent to overturn it, we have no basis for concluding that Swierkiewicz is no longer good law."); Westmoreland v. Prince George's County, Maryland, Civil Action No. 09-CV-2453 AW, 2010 WL 3369169, at *3 n.5 (Aug. 23, 2010)("The Twombly Court made clear that its holding did not contradict the Swierkiewicz rule that a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a prima facie case of discrimination.")(internal quotation marks omitted); Goodman v. Merrill Lynch & Co., No. 09 Civ. 5841(SAS), 2010 WL 1404155, at *4 (S.D.N.Y. Apr. 6, 2010)("Twombly itself held that Swierkiewicz remains good law."); see also Desrouleaux v. Quest Diagnostics, Inc., No. 09-61672-CIV, 2009 WL 5214964, at *2 (S.D. Fla. Dec. 29, 2009)(holding that Twombly and Iqbal "did not necessarily overturn Swierkiewicz" and stating "this Court will continue to

follow Swierkiewicz in the employment discrimination context"). But see Kleehammer v. Monroe Cnty., No. 09-CV-6177-CJS, 2010 WL 3609707, at *6 (W.D.N.Y. Sept. 8, 2010)(stating that "some courts and commentators have concluded that Twombly and Iqbal repudiated Swierkiewicz, at least to the extent that Swierkiewicz relied upon pre-Twombly pleading standards").

### C.  Reconciling **Twombly**, **Iqbal**, and **Swierkiewicz**

At least two courts have reconciled Swierkiewicz, Twombly, and Iqbal by holding that a complaint need not establish a prima facie case of employment discrimination to survive a motion to dismiss, but the claim must be facially plausible and must give fair notice to the defendants of the basis for the claim. Barbosa v. Continuum Health Partners, Inc., 09 Civ. 6572(SAS), 2010 U.S. Dist. LEXIS 21052, at *8 (S.D.N.Y. Mar. 5, 2010); see also Kleehammer, 2010 WL 3609707, at *6 (finding reasoning in Barbosa persuasive and applying that standard).  The standard stated in Barbosa appears to this Court to be an accurate distillation of the principles stated in Swierkiewicz, Twombly, and Iqbal.  Accordingly, this Court will review Plaintiff's Amended Complaint to determine whether it is facially plausible and gives fair notice to Defendants as to the basis for Plaintiff's claim.

## IV.  Discussion

### A.  Discrimination Claims

Plaintiff's discrimination claims are set forth in Counts I through V.  Count I alleges that Merrill Lynch violated Title VII of the Civil Rights Act of 1964.  Count II charges Merrill Lynch and Misiano with violating 42 U.S.C. § 1981.  Counts III and IV allege, respectively, that Merrill Lynch and Misiano violated the Rhode Island Fair Employment Practices Act ("RIFEPA").[3]  Count V alleges that both Defendants violated the Rhode Island Civil Rights Act ("RICRA").

### B.  Analysis

Following the approach described in <u>Iqbal</u>, the Court begins its analysis by identifying the allegations in the Amended Complaint that are not entitled to the assumption of truth. <u>Iqbal</u>, 129 S.Ct. at 1950.  Defendants contend that there are seven such allegations:

1.  Defendants knew Plaintiff's race, place of birth, and religion.  Amended Complaint ¶ 3.

2.  Merrill Lynch employs few Muslims or African-Americans as investment specialists.  <u>Id.</u> ¶ 40.

3.  Plaintiff was treated less favorably than similarly-situated white investment specialists.  <u>Id.</u> ¶ 41.

4.  Plaintiff was treated less favorably than similarly-

---

[3] Count III charges Merrill Lynch with violating RIFEPA without citing any particular provision, <u>see</u> Amended Complaint ¶¶ 50-51, while Count IV alleges specifically that Misiano violated § 28-5-7(6), <u>see</u> <u>id.</u> ¶¶ 52-53.

           situated white investment specialists with accents.
           <u>Id.</u> ¶ 42.

5.     Similarly-situated investment specialists with lower or
       comparable QA scores not in Plaintiff's protected
       classes were not terminated.  <u>Id.</u> ¶ 43.

6.     Defendants disciplined and terminated Plaintiff because
       of his race, color, national origin, and religion.  <u>Id.</u>
       ¶ 44.

7.     Defendants' actions constitute disparate treatment of
       Plaintiff based on his race, color, national origin,
       and religion.  <u>Id.</u> ¶ 45.

Defendants' Mem. at 7.

    The Court agrees that the third, fourth, sixth, and seventh allegations are not entitled to the assumption of truth because they "amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim." <u>Iqbal</u>, 129 S.Ct. at 1951 (quoting <u>Twombly</u>, 550 U.S. at 555).  However, the remaining allegations on their face do not appear to be conclusory.  Rather, they seem to allege specific facts.

    The first allegation that Defendants knew Plaintiff's race and place of birth, <u>see</u> Amended Complaint ¶ 3, is plausibly supported by Plaintiff's averments that he has dark brown skin, <u>id.</u> ¶ 2, that he is of African descent, <u>id.</u>, that he was born in Nigeria and immigrated to the United States in 2001, <u>id.</u>, that he speaks with an accent,[4] <u>id.</u> ¶ 16, that some customers who spoke

---

    [4] The fact that Defendant was born in Nigeria and did not immigrate to the United States until 2001 makes it reasonable to infer that he speaks with a Nigerian accent.  <u>See</u> Amended Complaint ¶ 16. It is also reasonable to infer that his accent suggests foreign birth.

with Plaintiff asked to be transferred to someone "who spoke 'American English,'"[5] _id._ ¶ 20, that Merrill Lynch interviewed him for employment as an investment specialist, _id._ ¶ 9, that Misiano was one of his supervisors, _id._ ¶ 9, and that Misiano terminated him, _id._ ¶ 38.  It can be reasonably inferred from these averments that Defendants were aware of Plaintiff's race and that his country of origin was Nigeria.  Defendants would have acquired this information simply by looking at, listening to, and interacting with Plaintiff.

With respect to the allegation that Defendants knew Petitioner's religion, _see_ Amended Complaint ¶ 3, it is admittedly more  difficult to identify specific averments in the Amended Complaint which support an inference that Defendants possessed this knowledge.  Unlike race and one's country of origin, a person's religion cannot normally be ascertained merely by looking at him, listening to him speak, and interacting with him.  Nigeria has a sizeable Christian population.[6]  Thus, being

---

[5] The Court cites this averment as further evidence that Plaintiff's accent would be apparent to anyone, including Defendants, who heard him speak.

[6] According to the U.S. Department of State:

While some groups estimate the population [of Nigeria] to be 50 percent Muslim, 40 percent Christian, and 10 percent practitioners of indigenous religious beliefs, it is generally assumed that the proportions of citizens who practice Islam and citizens who practice Christianity are roughly equal and included  a  substantial  number  who  practice  indigenous religious beliefs alongside Christianity or Islam.

from Nigeria does necessarily mean that the person is a Muslim.

On the other hand, Plaintiff alleges that some customers asked him if was a Muslim, id. ¶ 17, that some customers asked him what he thought of Osama Bin Laden and terrorists, id. ¶ 18, and that some customers expressed their dislike for Muslims, id. ¶ 19.  He attributes the inquiries about his religion and national origin to three circumstances: his accent which "suggests foreign birth," Memorandum in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss Plaintiff's Amended Complaint and Request for Hearing ("Plaintiff's Mem.") at 11; his name (Abdul-Giyath O. Mayale-Eke) which "seems foreign," id.; and the fact that "'Abdul' is a typical Muslim name," id.  The Court agrees that it is plausible that a person from Nigeria would likely have an accent suggesting foreign birth, that Plaintiff's name suggests foreign birth, and that many Americans would associate the name "Abdul" with a person of Arab or Muslim descent.[7]

---

Bureau of Democracy, Human Rights, and Labor, International Religious Freedom Report 2009 (Oct. 26, 2009), available at http://www.state.gov/g/drl/rls/irf/2009/127249.htm

[7] Plaintiff also alleges that the telephone conversations were monitored and recorded, see Amended Complaint ¶ 22, and states that the Court "can infer that customer complaints about Mayale-Eke precipitated Defendants' review of recorded conversations between Mayale-Eke and dissatisfied customers, some of which contained discussion of Mayale-Eke's religion and national origin."  Memorandum in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss Plaintiff's Amended Complaint and Request for Hearing ("Plaintiff's Mem.") at 11.  Plaintiff suggests this as an additional or alternative source of the knowledge which he asserts they possess.  See id.

After consideration, the Court concludes that additional averments in the Amended Complaint explaining how Defendants knew Plaintiff's religion are not required.  Plaintiff directly interacted with Kelly and Misiano, see Amended Complaint ¶¶ 9, 33, 38, and it is plausible that he would know whether they were aware of his religion.  Furthermore, he has specifically alleged that they knew his religion.  Id. ¶ 3.  "Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations."  Twombly, 550 U.S. at 556 (alteration in original); see also Iqbal, 129 S.Ct. at 1951 ("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.").  Accordingly, I find the statement that Defendants knew Plaintiff's religion is not a conclusory allegation.  Defendants' argument to the contrary is rejected.

With regard to the second allegation, i.e., that Merrill Lynch employs few Muslims or African-Americans as investment specialists, it is reasonably plausible that Plaintiff, having been hired, trained, and employed by Merrill Lynch as an investment specialist for a total of eight months, would have some basis for this belief based at least on his own observations.  Therefore, it is not a conclusory allegation.

The fifth allegation, i.e., that similarly-situated investment specialists with lower or comparable QA scores not in

15

Plaintiff's protected classes were not terminated, <u>see</u> Amended Complaint ¶ 43, on its face is factual.  However, Plaintiff admits in his memorandum that he is not privy to the QA scores of fired and retained investment specialists.  <u>See</u> Plaintiff's Mem. at 12.  Despite this admission, Plaintiff argues that there is a reasonable basis to infer that this is true because it is highly improbable that Merrill Lynch would fire everyone who had not attained the group average QA score.  <u>See</u> <u>id.</u>  Plaintiff notes that such a policy would be contrary to the plain written terms of the Handbook and the incentive program, which promises a reward—not termination—to any investment specialist who achieves a 75% score.  <u>See</u> <u>id.</u> at 12-13.  Plaintiff also argues that he does not need to plead this allegation to survive the Motion to Dismiss.  <u>See</u> <u>id.</u> at 13.

Given Plaintiff's admission that he lacks direct knowledge, the Court finds that it is a stretch to say the fifth allegation can be reasonably inferred from the factual averments in the Amended Complaint.  Thus, I find that it is a conclusory statement.  However, this determination is not fatal to the sufficiency of Plaintiff's Amended Complaint.  As the Seventh Circuit has noted:

> <u>Bell Atlantic</u>'s explicit praise of Form 9 of the Federal
> Rules of Civil Procedure illustrates that conclusory
> statements are not barred entirely from federal
> pleadings.  The Court noted that a complaint of
> negligence in compliance with Form 9 provides sufficient
> notice to defendants, even though it alleges only that

16

> the defendant, on a specified date, "negligently drove a
> motor vehicle against plaintiff who was then crossing [an
> identified] highway." Bell Atlantic, 127 S.Ct. at 1977;
> see also Iqbal v. Hasty, 490 F.3d 143, 156 (2d Cir.
> 2007). To survive dismissal at this stage, the complaint
> need not state the respects in which the defendant was
> alleged to be negligent (i.e., driving too fast, driving
> drunk, etc.), although such specificity certainly would
> be required at the summary judgment stage. Bell
> Atlantic, 127 S.Ct. at 1977; Iqbal, 490 F.3d at 156. In
> these types of cases, the complaint merely needs to give
> the defendant sufficient notice to enable him to begin to
> investigate and prepare a defense.

Tamayo v. Blagojevich, 526 F.3d 1074, 1084-85 (7th Cir. 2008).

This Court agrees that to survive dismissal at this stage
Plaintiff need not plead evidence supporting the allegation that
similarly situated investment specialists with lower or
comparable QA scores not in Plaintiff's protected classes were
not terminated. Indeed, a comparison of the complaint found
sufficient in Tamayo to the instant Amended Complaint reveals
essentially equivalent allegations.

> Ms. Tamayo's complaint ... alleged that she is a female.
> She alleged facts regarding her promised and actual
> salary, as well as the salaries of other similarly
> situated male employees. She stated her belief that she
> was paid less than the similarly situated male employees
> both "because she was a woman and because she was 'not
> cooperating' with the Governor's Office and the [Illinois
> Department of Revenue] in their attempts to control the
> [Illinois Gaming Board]." She further alleged that she
> "has been subjected to adverse employment actions by
> Defendants on account of her gender," and she listed
> specific adverse employment actions. She stated that
> "Defendants have treated Plaintiff differently than
> similarly situated male employees and exhibited
> discriminatory treatment against Plaintiff in the terms
> and conditions of her employment on account of
> Plaintiff's gender." Finally, she stated that she filed
> two EEOC charges alleging sex discrimination and that she

17

was issued a right-to-sue notice.  These facts certainly
provide the defendants with sufficient notice to begin to
investigate and defend against her claim.  As we
explained in <u>Concentra</u>,[8] it is difficult to see what
more Ms. Tamayo could have alleged, without pleading
evidence, to support her claim that she was discriminated
against based-at least in part-on her sex.

<u>Id.</u> at 1085 (internal citations omitted).

In summary, Defendants' contention that the first and second
allegations listed on page 11 are legal conclusions is rejected.
Those allegations are entitled to the presumption of truth.  The
remaining allegations (3 through 7) are conclusory.

Having identified the allegations that are not entitled to
the assumption of truth, the Court now considers the remaining
factual allegations to determine if they plausibly suggests an
entitlement to relief.  <u>See</u> <u>Iqbal</u>, 129 S.Ct at 1951.  Defendants
acknowledge that the "Amended Complaint alleges facts sufficient
to establish that Plaintiff is in a protected class – he was born
in Nigeria, has a dark brown skin color, is Muslim[,] and is of
African descent – and that Defendants took an adverse employment
action against him by terminating his employment," Memorandum in
Support of Defendants' Motion to Dismiss Plaintiff's Amended
Complaint and Request for Hearing ("Defendants' Mem.") at 9.
What is lacking, according to Defendants, is any factual
allegation that Plaintiff "was terminated *because of his*

---

[8] <u>Equal Employment Opportunity Comm'n v. Concentra Health Servs.,
Inc.</u>, 496 F.3d 773 (7th Cir. 2007).

18

*protected status*," id. at 9 (citing O'Connor v. Northshore Int'l Ins. Servs., 61 Fed. Appx. 722, 734-24 (1st Cir. 2003))(bold omitted).  However, Plaintiff's Amended Complaint explicitly states that Defendants "disciplined and terminated Mayale-Eke because of his ... race, color, national origin, and religion." Amended Complaint ¶ 44.  Thus, it is clearly distinguishable from the complaint which was found deficient in O'Connor.  There the plaintiff failed to allege "that she was fired for a reason prohibited by Title VII, i.e., that she was fired because of her religion."  O'Connor, 61 Fed. Appx. at 724.

Defendants posit that "Plaintiff will likely argue that this Court can infer discrimination based on comments to him by some customers, complaints against him by some customers[,] and the temporal proximity of those complaints to his warnings and termination."  Defendants' Mem. at 9.  Defendants challenge this argument by pointing out that Plaintiff does not allege that the customers who made comments to him regarding his "protected statuses," id., were the same customers who complained about him to Defendants and that these customers referred to Plaintiff's race, country of origin, and/or religion when they made such complaints, see id.  While this is true, virtually the only way Plaintiff would know such information at this juncture would be if Defendants had told him that he was being disciplined and terminated because customers had complained about his race,

national origin, and religion.  It is unrealistic to think that
in the 21st century any sophisticated employer would make such a
statement to an employee.  See Gorence v. Eagle Food Ctrs., Inc.,
242 F.3d 759, 762 (7th Cir. 2001)("After over three and a half
decades of laws prohibiting discrimination in one form or
another, employers are fairly unlikely to be caught making
statements such as, 'I fired Judy because she was an old
woman.'"); Marcy v. Delta Airlines, 166 F.3d 1279, 1284 (9th Cir.
1999)("[A]n employer is unlikely ever to offer such a reason for
discharging an employee."); Norton v. Sam's Club, 145 F.3d 114,
119 (2nd Cir. 1998)("[P]laintiffs in discrimination suits often
must rely on the cumulative weight of circumstantial evidence
since '[a]n employer who discriminates is unlikely to leave a
"smoking gun," such as a notation in an employee's personnel
file, attesting to a discriminatory intent.'")(quoting Rosen v.
Thornburgh, 928 F.2d 528, 533 (2nd Cir. 1991))(second alteration
in original); Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37
(2nd Cir. 1994)("In assessing the inferences that may be drawn
from the circumstances surrounding a termination of employment,
the court must be alert to the fact that [e]mployers are rarely
so cooperative as to include a notation in the personnel file
that their actions are motivated by factors expressly forbidden
by law.")(alteration in original)(internal quotation marks
omitted); id. ("In reality ... direct evidence of discrimination

20

is difficult to find precisely because its practitioners deliberately try to hide it.")(alteration in original)(internal quotation marks omitted).

Defendants further argue that even if the customers who complained to Defendants referred to Plaintiff's race, national origin, and/or religion in the process, this only suggests inappropriate motives on the part of those customers and does "not plausibly establish that Defendants terminated Plaintiff because of his protected status."  Defendants' Mem. at 10.  Thus, Defendants contend that Plaintiff's allegations "do not satisfy the plausibility standard articulated in [Iqbal] and Twombly, which asks for more than a sheer possibility that a defendant has acted unlawfully."  Id. (citing Iqbal, 129 S.Ct. at 1949; Twombly, 550 U.S. at 556-57); see also id. ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlements to relief.")(quoting Iqbal, 129 S.Ct. at 1949 (internal quotation marks and citations omitted)).

This Court finds, however, that the following facts pled by Plaintiff are sufficient to "nudg[e] his claim of purposeful discrimination 'across the line from conceivable to plausible.'" Iqbal, 129 S.Ct. at 1952 (quoting Twombly, 550 U.S. at 570) (alteration in original)(internal quotation marks omitted).  In reaching this conclusion, the Court notes that the requirement

for plausible grounds to infer an unlawful motive "does not impose a probability requirement at the pleading stage[.]" Twombly, 550 U.S. at 545.  It simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal motive.  See id.

First, Plaintiff's job performance for the first quarter, as measured by Merrill Lynch's own objective QA score, was sufficient to make him eligible to participate in the company's incentive system.[9]  See Amended Complaint ¶¶ 26-28.  Second, after Kelly issued the First Written Warning, Plaintiff was informed that he received a bonus for his performance in the first quarter of 2008.  See id. ¶ 30.  Third, despite attaining QA scores sufficient to entitle him to participate in the

---

[9] Defendants note that Plaintiff has not explicitly pleaded that he was performing satisfactorily, see Defendants' Reply Memorandum in Support of Their Motion to Dismiss Plaintiff's Amended Complaint ("Defendants' Reply") at 4 n.2, and suggest that allegations that customers complained about him and threatened to withdraw their money are inconsistent with any such contention, see id.  While it is true that adequate job performance is one of the elements of a prima facie case in an employment discrimination case involving wrongful termination, see Rodriguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52, 58 (1st Cir. 2005), Plaintiff is not required to plead a prima facie case, see Swierkiewicz, 534 U.S. at 508.  Thus, his failure to plead that he was performing satisfactorily cannot be a basis for dismissal.  In addition, it can be reasonably inferred from Plaintiff's allegation that his QA score entitled him to receive a bonus that his performance was adequate.  Lastly, while a party could plead himself out of court by pleading facts that establish an impenetrable defense to his claims, see Tamayo v. Blagojevich, 526 F.3d 1074, 1086 (7th Cir. 2008), Plaintiff's belief is that customers complained about his race, country of origin, and religion to Defendants and that Defendants improperly acted on such complaints.  Thus, Plaintiff's allegation that customers complained about him does not establish "an impenetrable defense" to his claim for unlawful termination.

company's incentive system and to receive a bonus, Defendants suddenly imposed a performance standard on Plaintiff which is not found in the Handbook and is seemingly inconsistent with the standard that investment specialists who attain QA scores of 75% or greater are eligible to receive a bonus.  See id. ¶¶ 29, 31-32.  Defendants required that Plaintiff satisfy this new performance standard "immediately."[10]  Id. ¶ 31.  Fourth, only two weeks after issuing the First Written Warning, Defendants issued the Final Written Warning, again demanding that Plaintiff "immediately" satisfy the newly announced standard.[11]  Id. ¶¶ 32, 37.  Fifth, even though during the brief two week period following issuance of the First Written Warning Plaintiff raised his QA score to 82.54, Defendants issued the Final Written Warning and then terminated him only two weeks later.  Id. ¶¶ 37-38.  Sixth, the two warnings were issued proximately in time to customers' inquiries of Plaintiff regarding his country of origin and religion and customers' complaints to Merrill Lynch about Plaintiff.  Id. ¶¶ 23, 34, 38.  Seventh, Misiano told Plaintiff when terminating him that "he was a 'business risk' and was causing clients to take their business away from Merrill Lynch."

---

[10] Plaintiff validly points out that it is mathematically quite difficult for everyone in a group to achieve at least the average score of their group.  See Plaintiff's Mem. at 5.

[11] It can be reasonably inferred that Plaintiff did not have any notice of the standard prior to the First Written Warning.

Id. ¶ 39.  Eighth, Merrill Lynch employs few Muslims or African Americans as investment specialists.  Id. ¶ 40.

The Court is persuaded that the above facts are sufficient to cast doubt on Defendants' claim that Plaintiff was fired for poor performance.  See Chambers, 43 F.3d at 37 ("Circumstances contributing to a permissible inference of discriminatory intent may include ... the sequence of events leading to the plaintiff's discharge."); Few v. Yellow Freight Sys., Inc., 845 F.2d 123, 124 (6th Cir. 1988)(affirming verdict in favor of plaintiff where trial judge found that defendant "deliberately built a file against her in order to be able to terminate her"); Hatcher-Capers v. Haley, 786 F.Supp. 1054, 1063 (D.D.C. 1992)(finding plaintiff proved she was victim of unlawful discrimination in the form of disparate treatment on the basis of her race and gender in part because "the reason proffered by the defendant for its failure to promote the plaintiff, namely, a policy of limiting the availability of promotions which was never publicized and not adopted out of financial necessity or budgetary constraints, is a mere pretext for discrimination");[12] cf. St. Mary's Honor Ctr. v.

---

[12] Defendants object to statements in Plaintiff's memorandum that they applied "a surprise standard" and "a private policy" to him, asserting that he "has pleaded no such facts in his Amended Complaint."  Defendants' Reply at 3 n.1 (citing Plaintiff's Mem. at 1, 5).  However, Plaintiff alleges that "[a] requirement that specialists attain the average score for their team ... cannot be found anywhere in the Handbook," Amended Complaint ¶ 32, and that "such a standard is inconsistent with the written Handbook policy that investment specialists with a score of 70% participate in the incentive system and the provision that investment specialists with a 75% score or more

Hicks, 509 U.S. 502, 511, 113 S.Ct. 2742 (1993)("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of a prima facie case, suffice to show intentional discrimination."); Ryther v. KARE 11, 108 F.3d 832, 836 (8th Cir. 1997)("[W]hen the plaintiff's evidence ... challenges the defendant's articulated nondiscriminatory reason, such evidence may serve as well to support a reasonable inference that discrimination was a motivating reason for the employer's decision.").

Defendants assert that Plaintiff cannot rest his discrimination claims solely on the unbelievability of Defendants' reason. See Defendants' Reply Memorandum in Support of Their Motion to Dismiss Plaintiff's Amended Complaint ("Defendants' Reply") at 4 (citing St. Mary's Honor Ctr., 509 U.S. at 514-15; Sellers v. U.S. Dep't of Defense, 654 F.Supp.2d 61, 68 (D.R.I. 2009)). While this is true at the summary judgment and trial stages, see St. Mary's Honor Ctr., 509 U.S. at 505 (stating that the challenged finding was made "[a]fter a full bench trial"); Sellers, 654 F.Supp.2d at 65 (noting standard for summary judgment), the Court is unpersuaded that disbelief of the reason stated by an employer for an employee's termination when

---

get a bonus," id. Given these averments, it can be reasonably inferred that the standard Plaintiff was ordered to meet had not been previously publicized.

combined with the other circumstances previously described, <u>see</u>
Discussion section IV. B. <u>supra</u> at 22-24, is insufficient to
nudge a plaintiff's claim of purposeful discrimination across the
line from conceivable to plausible, <u>see</u> <u>Iqbal</u>, 129 S.Ct. at 1952;
<u>see also</u> <u>Patterson v. U.P.S., Inc.</u>, Civil Action No. 07-00857-CG-
B, 2009 WL 481901, at *11 (S.D. Ala. Feb. 23, 2009)("Although the
Supreme Court in <u>Hicks</u> rejected the position that disbelief of
the employer's proffered reasons *requires* judgment for the
plaintiff, the Court was careful to explain that such disbelief,
in tandem with the plaintiff's prima facie case, is sufficient to
*permit* the fact-finder to infer discrimination."); <u>cf.</u> <u>Vieques</u>
<u>Air Link, Inc. v. U.S. Dep't of Labor</u>, 437 F.3d 102, 108-09 (1st
Cir. 2006)(stating "the general rule in employment discrimination
cases that 'a plaintiff's prima facie case, combined with
sufficient evidence to find that the employer's asserted
justification is false, may permit the trier of fact to conclude
that the employer unlawfully discriminated'")(quoting <u>Reeves v.</u>
<u>Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 148, 120 S.Ct.
2097 (2000)).

In sum, Plaintiff's Amended Complaint, like the complaints
in <u>Swierkiewicz</u> and <u>Tamayo</u>, satisfies the requirements of Rule
8(a) because it gives Defendants fair notice of the basis for
Plaintiff's claims.  See <u>Swierkiewicz</u>, 534 U.S. at 514; <u>Tamayo</u>,
526 F.3d at 1085.  Plaintiff alleges that he was terminated

because of his race, color, national origin, and religion in violation of Title VII, RIFEPA, RICRA, and 42 U.S.C. § 1981. Amended Complaint ¶¶ 44, 46-65; see also Swierkiewicz, 534 U.S. at 514; Tamayo, 526 F.3d at 1085.  His Amended Complaint details the events leading to his termination, provides relevant dates, and includes the race of at least one of the relevant persons involved with his termination, Amended Complaint ¶ 9; see also Swierkiewicz, 534 U.S. at 514; Tamayo, 526 F.3d at 1085.  These allegations give Defendants fair notice of what Plaintiff's claims are and the grounds on which they rest.  See Swierkiewicz, 534 U.S. at 514; Tamayo, 526 F.3d at 1085.  In addition, they state claims upon which relief could be granted under Title VII, RIFEPA, RICRA, and 42 U.S.C. § 1981.[13]  Finally, Plaintiff's Amended Complaint satisfies the requirements of Twombly and Iqbal because it is facially plausible.

**C. RICRA Claims against Misiano**

In Fantini v. Salem State College, 557 F.3d 22 (1st Cir. 2009), the First Circuit held that there is no individual employee liability under Title VII.  See id. at 29-30. Defendants note that in accord with Fantini this Court has

---

[13] While race, color, national origin, and religion are protected classes under Title VII, RICRA, and RIFEPA, religion is not a protected class under 42 U.S.C. § 1981.  Noyes v. Kelly Servs., 488 F.3d 1163, 1167 n. 3 (9th Cir. 2007)("It is well established ... that § 1981 does not apply to claims of religious discrimination."). Accordingly, to the extent that Plaintiff purports to assert a religious discrimination claim based on § 1981, such claim is not cognizable and should be dismissed.

determined that RIFEPA's definition of employer does not provide a basis for individual liability.  See Defendants' Mem. at 11 (citing <u>Johnston v. Urban League of Rhode Island, Inc.</u>, No. C.A. 09-167 S, 2009 WL 3834129, at *1-2 (D.R.I. Nov. 13, 2009).[14] Although  Senior Judge Ronald R. Lagueux of this Court has previously held that there is individual liability under RICRA, <u>see</u> <u>Wyss v. Gen. Dynamics Corp.</u>, 24 F.Supp.2d 202, 211 (D.R.I. 1998); <u>Iacampo v. Hasbro, Inc.</u>, 929 F.Supp. 562, 573 (D.R.I. 1996), Defendants note that these decisions also found that there was no individual liability under Title VII, <u>see</u> <u>Wyss</u>, 24 F.Supp.2d at 204; <u>Iacampo</u>, 929 F.Supp.2d at 571.  Because of the <u>Fantini</u> court's contrary determination<i>,</i> Defendants argue that this Court should revisit individual liability under RICRA.  <u>See</u> Defendants' Mem. at 11-12.

It is true, as Defendants note, that the analytical framework developed in federal Title VII cases is "routinely applied" by Rhode Island courts to claims brought pursuant to RIFEPA and RICRA.  <u>See</u> <u>Horn v. Southern Union Co.</u>, C.A. No. 04-

---

[14] Defendants are not seeking to dismiss Plaintiff's claim against Misiano under RIFEPA, presumably because Plaintiff alleges that "Misiano aided, abetted, incited, compelled, and coerced unlawful disparate treatment of [Plaintiff]."  Amended Complaint ¶ 53; <u>see also</u> <u>Johnston v. Urban League of Rhode Island, Inc.</u>, No. C.A. 09-167 S, 2009 WL 3834129, at *3 (D.R.I. Nov. 13, 2009)(citing R.I. Gen. Laws § 28-5-7(6) and recognizing that it "extends beyond employers and makes it unlawful employment practice for 'any person, <i>whether or not an employer</i> ... or employee, to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful employment practice'")(alteration in original).

434S, 2008 WL 2466696, at *7 n.5 (D.R.I. June 18, 2008)(quoting Kriegel v. Rhode Island, 266 F.Supp.2d 288, 296 (D.R.I. 2003)). This Court, however, is unpersuaded that Fantini and Johnston have undermined the continuing validity of Judge Lagueux's conclusion that individual liability exists under RICRA.

It is important to remember that RICRA "was enacted as a reaction to the United States Supreme Court decision in Patterson v. McLean Credit Union, 491 U.S. 164, 109 S.Ct. 2363 ... (1989), in which the Court narrowly interpreted 42 U.S.C. § 1981," Ward v. City of Pawtucket Police Dep't, 639 A.2d 1379, 1381 (R.I. 1994), and that the Rhode Island Supreme Court has described RICRA as "provid[ing] broad protection against all forms of discrimination in all phases of employment," id. Indeed, Judge Lagueux based his finding of individual liability primarily on these two facts. See Wyss, 24 F.Supp.2d at 211 ("The decision in Ward mandates that courts read the RICRA as broadly as possible-which means that if individuals discriminate in ways that violate the statute, then they must be liable under it."); id. ("Therefore, both the statute's broad language and the Ward opinion make it clear that RICRA contemplates individual liability.").

In short, this Magistrate Judge sees no reason to revisit the holdings in Wyss and Iacampo regarding RICRA when those holdings are based on an interpretation of state law which

appears consistent with general view of the statute as expressed
by the state supreme court.  See Allen v. Attorney Gen. of Maine,
80 F.3d 569, 575 n.6 (1st Cir. 1996)(noting "the general
proposition that federal courts must defer to a state supreme
court's interpretation of a statute of the state"); see also
Evans v. Rhode Island Dep't of Bus. Regulation, No. Civ.A. 01-
1122, 2004 WL 2075132, at *2 (R.I. Super. Aug. 21, 2004)(finding
that defendant "may be individually liable for conduct
constituting a violation under RICRA").

### D.  Intentional Infliction of Emotional Distress

Count 6 of the Amended Complaint charges Merrill Lynch and
Misiano with intentional infliction of emotional distress.
Amended Complaint ¶¶ 57-59.  However, it is clear that Plaintiff
cannot prevail on this claim because "the Rhode Island Workers'
Compensation Act provides the sole avenue of redress for
employees who have suffered intentional infliction of emotional
distress as a result of workplace sexual harassment and other
discrimination."  Iacampo, 929 F.Supp. at 581; cf. Censullo v
Brenka Video, Inc., 989 F.2d 40, 43 (1st Cir. 1993)(stating that
"[t]he district court correctly found that the workmen's
compensation statute bars employees from suing their employers
for personal injuries arising out of the employment relationship)
(applying New Hampshire law).

Plaintiff apparently recognizes that this claim is barred

because he states in his memorandum that he "voluntarily dismisses his Intentional Infliction of Emotional Distress claims against Defendants." Plaintiff's Mem. at 18. As no formal notice of dismissal has been filed to date, I recommend that the Motion be granted as to Count 6.

## VI. Conclusion

For the reasons explained above, I recommend that the Motion to Dismiss be granted as to Count VI. I further recommend that the Motion be granted to the extent that Plaintiff asserts a religious discrimination claim based on an alleged violation of 42 U.S.C. § 1981 (Count II) as such claim is not cognizable under that statute. In all other respects, I recommend that the Motion be denied.

Any objections to this Report and Recommendation must be specific and must be filed with the Clerk of Court within fourteen (14) days of its receipt. See Fed. R. Civ. P. 72(b); DRI LR Cv 72(d). Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district court and of the right to appeal the district court's decision. See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).

/s/ David L. Martin
DAVID L. MARTIN
United States Magistrate Judge
September 29, 2010