UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

ABDUL-GIYATH O. MAYALE-EKE  :
           :
    v.      :  C.A. No. 10-029S
           :
MERRILL LYNCH, PIERCE, FENNER :
& SMITH, INC., d/b/a BANC OF  :
AMERICA INVESTMENT SERVICES, :
INC., and JASON MISIANO    :

## REPORT AND RECOMMENDATION

Lincoln D. Almond, United States Magistrate Judge

   Plaintiff, Abdul-Giyath O. Mayale-Eke, initiated this action in State Court in early 2010 and it was subsequently removed by Defendants to this Court due to the presence of a federal question under Title VII. See 28 U.S.C. §§1331 and 1441. Plaintiff alleges he was disciplined and ultimately terminated because of his "race, color, national origin, and religion," and treated "less favorably than similarly-situated white investment specialists" by his former employer, Merrill Lynch, Pierce, Fenner & Smith d/b/a Banc of America Investment Services, Inc. ("Merrill Lynch"), and his former supervisor, Jason Misiano, sued in his individual capacity. (Document No. 69, p. 7). Plaintiff asserts several state and federal statutory claims of discrimination based on his race, color, religion and national origin. In particular, Plaintiff sues Merrill Lynch under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., alleging disparate treatment (Count I). Plaintiff sues both Defendants under 42 U.S.C. § 1981 alleging disparate treatment (Count II). Plaintiff sues both Defendants under Rhode Island's Fair Employment Practices Act ("RIFEPA"), R.I. Gen. Laws § 28-5-1, et seq., alleging disparate treatment (Counts III and IV). Finally, Plaintiff sues both

Defendants under the Rhode Island Civil Rights Act ("RICRA"), R.I. Gen. Laws § 42-112-1, et seq. alleging disparate treatment (Count V).

Defendants move for summary judgment as to all claims against them. (Document No. 72). Plaintiff opposes the Motion. (Document No. 75). Defendants' Motion for Summary Judgment has been referred to me for preliminary review, findings and recommended disposition. See 28 U.S.C. § 636(b)(1)(B); LR Cv 72. A hearing was held on April 8, 2013. After reviewing the Memoranda submitted, listening to the arguments of counsel and reviewing relevant research, I recommend that Defendants' Motion for Summary Judgment (Document No. 72) be DENIED.

**Facts**

Plaintiff is a black male, his color is dark-skinned, his religion is Islam and his country of national origin is Nigeria. (Document No. 72-2, ¶ 199). Plaintiff began working at Merrill Lynch as an Investment Specialist on October 1, 2007. Id. ¶ 36. Plaintiff's first two weeks of employment consisted of classroom training on topics including customer satisfaction. Id. ¶ 39, 40. Plaintiff was taught in training that he needed to please customers and that the customer is always right. Id. ¶ 41. Plaintiff was also given guidance on handling difficult customers. Id. ¶ 42. Plaintiff received a copy of the Merrill Lynch User's Guide during his training, which detailed how Quality Assurance Analysts and Managers would monitor and score the telephone calls he handled. Id. ¶ 43.

After completing the training, Plaintiff engaged in a week of "nesting" in which he and other new Investment Specialists from his training class all sat together in the Lincoln, Rhode Island Investment Center, with a Senior Investment Specialist to provide guidance, support and feedback. Id. ¶ 46. Following his training, Trainer Ken Carlson provided feedback to Plaintiff regarding his performance and potential. He indicated that Plaintiff had "a solid understanding of areas of

brokerage that others would be weaker in...Abdul will be good at his job given time to improve his speed." (Document No. 75-3, ¶¶ 288-293). Upon completion of "nesting," Plaintiff was assigned to the team of Investment Specialists reporting to Team Manager Joseph Kelly. (Document No. 72-2, ¶ 47).

While employed as an Investment Specialist, Plaintiff answered between fifty and seventy-five calls per day. Id. ¶ 48. An Investment Specialist's calls were periodically monitored by their Managers and also by Quality Assurance Analysts. Between October 2007 and May 2008, each Quality Assurance Analyst typically scored three calls per month for the Investment Specialists assigned to him or her for that month, and each Manager typically scored two calls per month for each Investment Specialist on his or her team. Id. ¶ 18. Additionally, each Investment Specialist was required to document a summary or "note" of the content of every call in a computer system called "IRIS." Each IRIS note contains a date and time stamp, the Investment Specialist's name and a brief description of the customer's inquiry. When deciding whether to transfer or "escalate" a call to a Manager, Investment Specialists were required to take note of prior IRIS notes on the account to understand the nature of prior interactions between Merrill Lynch and the customer. If a customer called an Investment Specialist and then asked for a Manager, the two IRIS notes about the same customer and same issue would be stamped close in time. (Document No. 76, ¶ 12; Document No. 75-3, ¶ 387).

Throughout his employment, Plaintiff had monthly meetings with his Team Manager and the Quality Assurance Analysts, who scored his calls for the month, to discuss his strengths and weaknesses and identify areas for improvement. (Document No. 72-2, ¶ 49). Plaintiff was able to review some of the scores he received at these monthly meetings. Id. ¶ 50; Document No. 76, ¶ 50.

In December 2007, Plaintiff noted in his performance development plan that "with my quality scores I'm woringto [sic] make progress based on feedback from Manager and QA analyst." (Document No. 72-2, ¶ 74).  By the end of 2007, Mr. Kelly asserts that he believed, at the time, that there were fundamental flaws with Plaintiff's interactions with customers: among other things, he was curt, combative, rude and discourteous; he frustrated and inconvenienced clients; and was unable to fulfill simple requests.  Id. ¶ 69.  Mr. Kelly claims he became aware of these client issues because Plaintiff himself escalated calls to Mr. Kelly, other Investment Specialist escalated calls to Mr. Kelly when the client called back dissatisfied shortly after speaking with Plaintiff, other Managers responding to escalations created by Plaintiff told Mr. Kelly about those escalations and through Mr. Kelly's own observations of Plaintiff.  Id. ¶ 70.  Mr. Kelly asserts that he determined at that time that Plaintiff's poor customer service, rude and discourteous tone, habit of inconveniencing clients, poor Quality Assurance Scores, frustration of clients, call escalations and inability to fulfill simple requests was part of a larger, consistent pattern.  (Document No. 75-3, ¶ 416).  Mr. Kelly indicates that he was alarmed by Plaintiff's behavior.  Id. ¶ 417.  However, at the same time, in his written review of Plaintiff in December 2007, Mr. Kelly observed that he was "Too New to Rate" and that he sees "great opportunity for knowledge and professional development." (Document No. 76, ¶ 65; Document No. 75-3, ¶ 353).

Plaintiff's Quality Assurance Score for October 2007 was 62.86%.  (Document No. 72-2, ¶ 95).  His November 2007 scores were 55.26%, 86.84% and 78.95%.  Id. ¶ 96.  His December 2007 scores were 68.42%, 71.05%, 71.05%, 73.68% and 65.79%.  This is an average of 70%.  Id. ¶ 97. Plaintiff's first scored call for December 2007 received a score of 68.72%.  Id. ¶ 98.

Plaintiff's January 2008 scores were 78.95%, 68.42%, 71.05%, 62.86% and 81.58%. Id. ¶ 101. Plaintiff's February 2008 Quality Assurance Scores were 73.68%, 78.95%, 76.32%, 86.84% and 94.74%. Id. ¶ 106. Plaintiff's March 2008 Quality Assurance Scores were 72.22%, 89.47%, 74.29%, 76.32% and 76.32%. Id. ¶ 108.[1] Plaintiff's average Quality Assurance Score for the first quarter of 2008 was 77.47%. Id. ¶¶ 111, 112.

In early 2008, Defendant implemented the "BAI Investment Center Incentive Plan," which governed incentive compensation for Investment Specialists in 2008. (Document No. 72-2, ¶ 23). The Plan identified two easily measurable factors on which quarterly incentive compensation would be based – call quality and productivity. Id. ¶ 25. Call quality was weighted 60% and productivity was weighted 40% for purposes of determining the site ranking for all Investment Specialists at the Lincoln Investment Center. (Document No. 78-1, ¶ 685). Additionally, an Investment Specialist had to receive a minimum quarterly average Quality Assurance Score of 70% to be eligible to participate in the Incentive Plan's "stack ranking." (Document No. 72-2, ¶ 32).

The "stack ranking" consists of all Investment Specialists who receive a minimum Quality Assurance Average of 70%. (Document No. 78-1, ¶ 318). Only the top 75% of those who made the stack ranking were eligible to receive an incentive payment. (Document No. 72-2, ¶ 33). The top

---

[1] Plaintiff's scorecards articulated some of the areas in which his Manager and the Quality Analysts felt he could improve. For example, the scorecard for his January 18, 2008 call in which he received a score of 68.42% indicated that Plaintiff failed to provide the client assurance of his willingness to help, failed to ask the client if he had any further questions that Plaintiff could assist with and noted "[a]ssociate was not aligned with the client during the conversation. Multiple times the client was attempting to create a conversation and the associate was unresponsive during the call." (Document No. 72-2, ¶ 102). His January 25, 2008 scorecard, for which he scored 71.05% noted an "[e]xtended gap of silence...." Id. ¶ 103. His January 29, 2008 scorecard for which he scored 81.58% noted, "please be aware o[f] talking over or interrupting the client while they are speaking." Id. ¶ 105. Plaintiff's scorecard for his February 25, 2008 phone call stated "[p]lease remember that we must set the expectation when a client will be on a prolonged hold." Id. ¶ 107. The scorecard for Plaintiff's March 11, 2008 call, on which he scored a 72.22% noted: "Please probe effectively to uncover relevant facts necessary to resolving the caller's needs" and "prolonged gaps in communication during the call. Please remember that when a client will be on a prolonged hold period we need to set the expectations prior to placing the client on hold. During this call the client was on hold for five minutes....Client disconnected the line." Id. ¶ 109.

5% of the quarterly stack ranking would receive a $3,000.00 incentive payment, the next 15% would receive a $1,500.00 incentive payment, the next 30% would receive a $750.00 incentive payment, the next 25% would receive a $500.00 incentive payment and the last 25% would receive nothing. Id. ¶ 34.

An Investment Specialist would be rendered ineligible for an incentive payment if he or she received a written warning during the preceding quarter. Id. ¶ 35. According to the 2008 Incentive Plan, an employee was required to maintain good attendance, avoid a written warning for any issue and cause no more than two trading errors in any given quarter to remain eligible for an incentive bonus. Furthermore, Merrill Lynch Managers had full discretion under the Incentive Plan to reduce incentive payments or cause an Investment Specialist to be ineligible for an award "if management determines a participant has not fulfilled all performance or compliance obligations...." (Document No. 76, ¶ 25; Document No. 75-3, ¶¶ 316, 317).

Plaintiff ranked 76 out of 77 Investment Specialists listed on the "stack ranking" for average Quality Assurance Scores for the first quarter of 2008. (Document No. 72-2, ¶ 113; Document No. 76, ¶ 113). However, Plaintiff ranked 17 out of 77 Investment Specialists at the Lincoln Center for availability[2] scores for the first quarter of 2008. His overall ranking with both scores combined was 56 out of 77 Investment Specialists in the stack ranking. (Document No. 75-3, ¶ 436). While 77 Investment Specialists were "stack ranked" for incentive payments, there were a total of 104 Investment Specialists employed at the Lincoln Center as of the fourth quarter of 2007, so approximately twenty-seven Investment Specialists were rendered ineligible by poor Quality Assurance Scores. (Document No. 78-1, ¶ 463). Plaintiff was sixth out of six Investment Specialists

---

[2]  Availability refers to availability to take a customer call and is a measure of productivity.

on Mr. Kelly's team for average Quality Assurance Scores for the first quarter of 2008.  (Document No. 72-2, ¶ 114).  For the first quarter of 2008, Plaintiff was awarded an incentive payment of $500.00.  Id. ¶ 117.

Justin Cahir, a Quality Analyst who scored some of Plaintiff's calls, recalled Plaintiff having a "very heavy accent."  He remembers customers pointing out to Plaintiff that it was sometimes difficult to understand him.  He recalls Plaintiff taking offense to that, and that it caused him to become very "short" and sometimes "irate" with customers.  (Document No. 75-3, ¶ 695).  Mr. Cahir did not know if Plaintiff raised his voice in order to be better understood.  Id. ¶ 697.  Plaintiff recalls being asked by customers where he was born and also to speak with someone who "speaks English" or "American English."  Id. ¶¶ 248, 249, 254.  He also recalled being asked if he was Muslim, and some customers asked additional questions about his faith and terrorism.  Id. ¶¶ 259-264.

As of the end of April 2008, Mr. Kelly asserts that he had received direct feedback from a minimum of three clients that they planned to close an account at Merrill Lynch because of Plaintiff. (Document No. 72-2, ¶ 93).  These customer complaints are undocumented.  Mr. Kelly indicates he was concerned at the time that Plaintiff was going to alienate, upset and infuriate more customers. Id. ¶ 135.  Mr. Kelly claims he believed that there was a risk of losing the client for every call that Plaintiff took.  Id. ¶ 194.

On April 30, 2008, Mr. Kelly issued an Action Plan/Written Warning to Plaintiff.  Id. ¶ 118. The Action Plan/Written Warning stated, "[t]his is an action plan/written warning to address a need for immediate improvement in two key areas of your performance in the position of Investment Specialist."  Id. ¶ 119.  The first area of performance identified in the Action Plan/Written warning

was "Quality Assurance Scores." Id. ¶ 120.  Plaintiff's average Quality Assurance Score for the first

quarter of 2008 was 77.47%, the Action Plan/Written Warning indicated that Plaintiff was "expected

to improve his Quality scores immediately, to be in line with the IC [Investment Center] average of

87.49." Id. ¶¶ 121, 122.

Mr. Kelly indicates that he gave Plaintiff an average Quality Assurance Score target number

to achieve going forward to make his expectations for Plaintiff clear and so that Mr. Kelly and

Plaintiff could assess his progress. Id. ¶ 124.  Mr. Kelly asserts that he determined at the time that

the average Quality Assurance Score for the Lincoln Investment Center for the previous quarter was

a reasonable target number for Plaintiff to achieve in the next two weeks. Id. ¶ 125.  Plaintiff

admitted that, at least as of April 30, 2008, he knew that he had to achieve an average Quality

Assurance Score of 87.49%. Id. ¶ 126.  Plaintiff testified, "I take responsibility for my performance.

If you set a standard I'm supposed to meet, its fair enough to come to me.  And it's left to me to

meet up.  And if I don't meet up, I will take responsibility for it." Id. ¶ 127.

The Action Plan/Written Warning's second area of performance was "Escalated

Issues/Proper handling of client issues." Id. ¶ 128.  In this area, the Action Plan/Written Warning

noted that Plaintiff "has numerous daily occurrences where client issues are escalated based on how

the call was handled as opposed to the specific account problem." Id.  It stated, "Abdul is expected

to appropriately handle client issues on an immediate basis.  This includes utilizing resources,

following proper escalation procedures, and paying close attention to the retention of the client

relationship." Id. ¶ 130.  The Action Plan/Written Warning stated, "you are expected to demonstrate

immediate and sustained improvement in the areas specifically addressed concerning your

performance, and to comply with the policies, procedures, guidelines and conditions of employment

set forth above.  Failure to meet expectations may result in further disciplinary action up to and including termination." Id. ¶ 132.

Mr. Kelly planned to meet with Plaintiff two weeks from the date of the Action Plan/Written warning. Id. ¶ 134.  Plaintiff believed that the Action Plan/Written warning was unfair because he was never told that he had to achieve an average Quality Assurance Score equal to the Investment Center average Quality Assurance Score. Id. ¶ 137.  Plaintiff did not put any comment in the Associate Comment Section of the Action Plan/Written Warning. Id. ¶ 136.

There were no systems in place for tracking or measuring call escalations on an Investment Center-wide basis in 2008. Id. ¶ 12.  Managers were not required to document escalations. Id. ¶ 13. There is no documentation of any call escalation caused by Plaintiff during the time period of December 28, 2007 and May 4, 2008 (date of his first written warning).  (Document No. 75-3, ¶ 371). Mr. Kelly claims to have listened to escalated phone calls in late 2007.  (Document No. 72-2, ¶ 66, 67).  Mr. Kelly did not document escalations in the January to April 2008 time frame because he testified he typically did not document escalations; rather he immediately addressed them with the Investment Specialist while the call was still fresh in the Investment Specialist's mind. Id. ¶ 92. According to Merrill Lynch, Plaintiff continued to create multiple call escalations after he received the Action Plan/Final Written Warning. Id. ¶ 181.  Mr. Kelly did not document all such escalations. Id. ¶ 182.

On May 13, 2008, Mr. Kelly administered an Action Plan/Final Written Warning to Plaintiff. Id. ¶ 163.  The Action Plan/Final Written Warning stated: "[t]his is an action plan/final written warning to address a need for immediate improvement in two key areas of your performance in the position of Investment Specialist." Id. ¶ 164.  It identified one key area of performance as "Quality

Assurance Scores" and the second key area was identified as "Escalated Issues/Proper handling of client issues." Id. ¶ 165, 170.  The Action Plan/Final Written Warning noted that Plaintiff's Quality Assurance Score for April through May 13 was 82.54% and that the Investment Center average was 87.49%.  Id. ¶ 165.  The "Expectations" portion of the Action Plan/Final Written Warning stated that Plaintiff was "expected to improve his Quality scores immediately, to be in line with the Investment Center average...."  Id. ¶ 166.  Mr. Kelly determined that the average Quality Assurance Score for the Lincoln Investment Center for the previous quarter was a reasonable target number for Plaintiff to achieve.  Id. ¶ 169.  Plaintiff's score had improved over five percentage points from his first quarter average of 77.47%.

The Action Plan/Final Written Warning also noted that, "[Plaintiff] has numerous daily occurrences where client issues are escalated based on how the call was handled as opposed to the specific account problem; [Plaintiff] has not utilized all resources available to him in order to resolve client issues.  There has been an increased reliance on resources prior to exhausting all that are readily available."  Id. ¶ 170.  The "expectations" portion stated, "[Plaintiff] is expected to appropriately handle client issues on an immediate basis.  This includes utilizing resources, following proper escalation procedures, and paying close attention to the retention of the client relationship."  Id. ¶ 171.  The Action Plan/Final Written Warning stated that the next meeting would be on May 20, 2008 to discuss status.  Id. ¶ 172.  It also stated, "you are expected to demonstrate immediate and sustained improvement in the areas specifically addressed concerning your performance, and to comply with the policies, procedures, guidelines and conditions of employment set forth above.  Failure to meet expectations may result in further disciplinary action up to an [sic]

including termination." Id. ¶ 173.  Plaintiff signed the Action Plan/Final Written Warning and did not add any comments in the Associate Comment Section.  Id. ¶ 174.

On May 30, 2008, Mr. Misiano and Mr. Kelly met with Plaintiff, and Mr. Misiano informed Plaintiff that Merrill Lynch was terminating his employment for failing to achieve the expectation in his Action Plan including failing to meet the Quality Assurance Score goal, continuing to create call escalations, failing to utilize all available resources for call escalations and for improper handling of client issues.  Id. ¶¶ 192, 193.

Plaintiff contends that both Action Plan/Written Warnings were discriminatory.  Id. ¶ 204; Document No. 76, ¶ 203.  He believes the Action Plan/Written Warnings and his termination were motivated by his race, color, religion and national origin.  (Document No. 72-2, ¶ 204).

### Summary Judgment

Summary judgment is appropriate if the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). When deciding a motion for summary judgment, the Court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor.  Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997).

Summary judgment involves shifting burdens between the moving and nonmoving parties. Initially, the burden requires the moving party to aver "an absence of evidence to support the nonmoving party's case."  Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).  Once the moving party meets this burden, the burden falls upon the nonmoving party, who must oppose the motion by presenting facts that show

a genuine "trialworthy issue remains." Cadle, 116 F.3d at 960 (citing Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)). An issue of fact is "genuine" if it "may reasonably be resolved in favor of either party." Id. (citing Maldonado-Denis, 23 F.3d at 581).

To oppose the motion successfully, the nonmoving party must present affirmative evidence to rebut the motion. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-257 (1986). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, [or] unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Moreover, the "evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." Id. (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)). Therefore, to defeat a properly supported motion for summary judgment, the nonmoving party must establish a trialworthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (citing Anderson, 477 U.S. at 249). Additionally, if the affirmative evidence presented by the nonmoving party raises a question of credibility as to the testimony provided by the moving party, summary judgment is inappropriate, and that credibility issue must be presented to the factfinders at trial. Firemen's Mut. Ins. Co. v. Aponaug Mfg. Co., 149 F.2d 359, 363 (5th Cir. 1945) ("The success of an attempt to impeach a witness is always a jury question, as is the credibility of the witnesses where they contradict one another or themselves.").

**Discussion**

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer...to discharge any individual, or otherwise to discriminate against any individual with respect to his...employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e-2(a) and (1).[3] Thus, a violation of Title VII occurs whenever race, religion or national origin is a motivating factor for an adverse employment action. In this case, Plaintiff does not rely on direct evidence of discrimination or a so-called "smoking gun." Thus, Plaintiff's proof of a Title VII violation is evaluated pursuant to the familiar three-step, burden-shifting framework established in McDonnell Douglas Corp. v. Green, 414 U.S. 811 (1973). See also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502 (1993); and Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). The First Circuit has thoroughly outlined this framework as follows:

> [STEP ONE] [T]he plaintiff shoulders the initial burden of adducing a prima facie case of unlawful discrimination. This includes a showing that: (1) plaintiff is a member of a protected class; (2) plaintiff's employer took an adverse employment action against him; (3) plaintiff was qualified for the employment he held; and (4) plaintiff's position remained open or was filled by a person whose qualifications were similar to his. Establishment of a prima facie case creates a presumption of unlawful discrimination.
>
> [STEP TWO] Once a plaintiff establishes a prima facie case, the burden [of production, not persuasion,] shifts to the employer to rebut this presumption by articulating a legitimate, non-discriminatory reason for its adverse employment action.

---

[3] The same analysis applies to Plaintiff's claims under 42 U.S.C. §1981, Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 95 (1st Cir. 1996), as well as the state law counts contained in Plaintiff's Complaint. See Kriegel v. State of Rhode Island Dep't of Corr., 266 F. Supp. 2d 288, 296 (D.R.I. 2003) (applying federal analysis to claims under FEPA and RICRA); and Russell v. Enter. Rent-A-Car Co., 160 F. Supp. 2d 239, 265 (D.R.I. 2001) ("FEPA is Rhode Island's analog to Title VII, and the Rhode Island Supreme Court has applied the analytical framework of federal Title VII cases to those brought under FEPA.") (citations omitted). Therefore, this Court will generally refer to Title VII in its analysis, but the analysis will also apply to Plaintiff's claims under § 1981, FEPA and RICRA.

> [STEP THREE]  In the third and final stage, the burden devolves upon the plaintiff to prove that the reasons advanced by the defendant-employer constitute mere pretext for unlawful discrimination.  To meet this burden, the plaintiff must prove not only that the reason articulated by the employer was a sham, but also that its true reason was plaintiff's [membership in a protected class]....

Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 19 (1st Cir. 1999) (citations and footnote omitted).

### A.       Step One - The Prima Facie Case

The First Circuit has instructed that "[t]he burden of making out a prima facie case is 'not onerous.'" Mesnick v. Gen. Electric Co., 950 F.2d 816, 823 (1st Cir. 1991) (quoting Burdine, 450 U.S. at 253).  The prima facie case framework established in McDonnell Douglas was "never intended to be rigid, mechanized or ritualistic." Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978).  In the present case, Plaintiff is a black male, his color is dark skinned, his religion is Islam and his country of national origin is Nigeria.  (Document No. 72-2, ¶ 199).  Plaintiff has therefore met the first prong of the prima facie test and has demonstrated that he is a member of a protected class.  The second prong of the prima facie test is also easily met, as Plaintiff's employer took an adverse employment action against him by disciplining him and ultimately terminating his employment.

The parties are at odds concerning the third and fourth prongs.  Defendants argue that Plaintiff was not qualified for the employment he held, and that he did not meet the "legitimate expectation for [his] position."  (Document No. 72-1, p. 10).  Defendants therefore assert that Plaintiff cannot satisfy the third prong of the test.  Similarly, Defendants contend that Plaintiff has failed to establish that the Investment Specialist position remained open or that it was filled by a person whose qualifications were similar to his, as required by the fourth prong.  Id.

Plaintiff's tenure at Merrill Lynch was relatively brief – he commenced employment on October 1, 2007 and was terminated on May 30, 2008.  Plaintiff concedes that he was not the strongest Investment Specialist in the Lincoln Investment Center.  However, the objective criteria submitted by Merrill Lynch, viewed in the light most favorable to Plaintiff as required on a Rule 56 motion,  indicates that Plaintiff was, at the very least, meeting expectations for his position, sufficient to satisfy the third prong of the test in this context.  For example, under the Bank's 2008 Incentive Plan, Plaintiff received an incentive payment of $500.00 for the first quarter of 2008.  See Drumm v. CVS Pharmacy, Inc., 701 F. Supp. 2d 200, 208 (D.R.I. 2010) (noting that plaintiff "easily met burden" of satisfying third prong of prima facie case, despite negative feedback and performance reviews, based upon evidence that her performance improved over time and that she received bonuses and salary increases).  Additionally, Merrill Lynch hired Plaintiff based, in part, on his undisputed professional qualifications, including the fact that he had earned his Series 7 and Series 64 licenses from the National Association of Securities Dealers.  Further, after being hired, Plaintiff successfully completed Merrill Lynch's new-hire training.  (Document No. 75-3, ¶ 285).  After reviewing the evidence in a light most favorable to Plaintiff as required, Defendants' arguments that Plaintiff was unqualified are unconvincing.  Thus, even though Plaintiff was disciplined and ultimately terminated in May 2008 for allegedly failing to meet the Quality Assurance Average, the Court finds the evidence presented to be sufficient to demonstrate, at this stage, that Plaintiff was at least minimally qualified to hold the position of Investment Specialist.

Similarly, Plaintiff has asserted that "[a]fter Mr. Mayale-Eke was terminated, Merrill [Lynch] continually hired and staffed the Lincoln Investment Center with investment specialists to do the same job as Mr. Mayale-Eke." (Document No. 75-3, ¶ 351).  Merrill Lynch counters that

Plaintiff's assertion is unsupported, but it does not affirmatively assert that it did not replace Plaintiff

or that it generally discontinued hiring Investment Specialists after Plaintiff's termination.  Given

the flexible nature of the proof required to establish a prima facie case, Plaintiff has met his burden

of establishing this final element of the test for purposes of summary judgment.  Plaintiff was not

in an upper-management position, but instead was one of many Investment Specialists, and it is

reasonable to presume that Merrill Lynch continued to staff the position after Plaintiff's termination.

Cosme v. Salvation Army, 284 F. Supp. 2d 229, 237 (D. Mass. 2003) (court assumed plaintiff had

proven final element of prima facie case despite "little credible evidence with respect to whether the

[defendant] was looking to hire anyone to fill [Plaintiff's] position.").  See also Torrech-Hernandez

v. Gen. Electric Co., 519 F.3d 41, 49 (1st Cir. 2008) ("minimal evidentiary showing is necessary to

satisfy an employee's burden of production at [the prima facie] stage.") Accordingly, Plaintiff has

met his burden as to all four elements of the prima facie test for purposes of this Rule 56 analysis.

**B.      Step Two – Defendants' Rebuttal**

The next step requires Defendants to articulate a legitimate, non-discriminatory reason for

the adverse employment action.  Here, Defendants easily meet their burden of production.  Merrill

Lynch sets forth numerous instances where Plaintiff's handling of customer telephone calls required

correction.  For example, Merrill Lynch relies upon deposition testimony of Mr. Kelly that several

clients threatened to pull their accounts because of Plaintiff (Document No. 72-2, ¶ 93) and that Mr.

Kelly believed there was a risk of losing clients for every call Plaintiff took.  Id. ¶ 194.

Additionally, Mr. Kelly testified that Plaintiff had a "habit of inconveniencing clients" and a "rude

and discourteous tone." (Document No. 75-3, ¶ 416).  Further, Merrill Lynch presented evidence

that Plaintiff's Quality Assurance Scores were below the Investment Center average (Document No.

72-2, ¶ 119-122) and testimony that he caused numerous call escalations.  Id. ¶ 128.  Defendants also introduced into evidence several scorecards that indicated areas in which Plaintiff required feedback concerning his interactions with clients.  Id. ¶¶  102, 103, 105, 107, 109.   Thus, Merrill Lynch has set forth "'through the introduction of admissible evidence,' reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action."  LeBlanc v. Great Am. Ins. Co, 6 F.3d 836, 845 (1st Cir. 1993). (emphasis omitted).  The First Circuit has explained, "[i]f the employer advances the required showing, the inference originally generated by the prima facie case drops from sight. In that event, it falls upon the plaintiff (who bears the burden of persuasion throughout) to show that the employer's alleged justification is a mere pretext" for unlawful discrimination.  Vega v. Kodak Carribean, Ltd., 3 F.3d 476, 479 (1st Cir. 1993).  For the foregoing reasons, Defendants have met their burden of production as to the second step of the Title VII burden-shifting framework for purposes of this Rule 56 analysis.

C.    Step Three – Pretext

"The 'ultimate touchstone' of the McDonnell Douglas analysis is whether the employer's actions were improperly motivated by discrimination." Kosereis v. Rhode Island, 331 F.3d 207, 213-214 (1st Cir. 2003) (citing Fite v. Digital Equip. Corp., 232 F.3d 3, 7 (1st Cir. 2000)).  The third step requires that Plaintiff prove not only that the reason articulated by the employer was a pretext, but also that its true reason was his race, religion and/or national origin.  "[I]n attempting to satisfy [his] evidentiary burden in the third stage of the McDonnell Douglas analysis, the 'plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.'" Benham v.

Lenox Sav. Bank, 118 F. Supp. 2d 132, 143 (D. Mass. 2000) (citing Reeves v. Sanderson Plumbing

Prod., Inc., 530 U.S. 133, 139 (2000)).  In the present case, Plaintiff argues that summary judgment

must be denied because he has presented sufficient evidence to create a genuine issue of material

fact as to whether Merrill Lynch's proffered reason for his firing was pretextual.

It is well established that in order to clear the summary judgment hurdle, the nonmovant

must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2).  In the

employment discrimination context, "the material creating the factual dispute must herald the

existence of 'definite, competent evidence' fortifying the plaintiff's version of the truth. Optimistic

conjecture, unbridled speculation, or hopeful surmise will not suffice." Vega, 3 F.3d at 479.

(citations omitted).

This Court has previously noted that "[t]here is no mechanical formula for finding pretext."

Schumacher v. Fairfield Resorts Inc., C.A. No. 05-500T, 2008 WL 821569, *11 (D.R.I. Mar. 27,

2008). "Plaintiffs can show that an employer's stated reasons are pretextual in any number of ways."

Kosereis, 331 F.3d at 214.  In the present case, Plaintiff has directly attacked his employer's

proffered reasons for termination and argues that he has set forth facts that support the inference that

Merrill Lynch did not act for its asserted non-discriminatory reason.  Second, Plaintiff has also

attempted to prove pretext by offering evidence that he was treated "differently than other, similarly

situated, employees." Benham, 118 F. Supp 2d at 144.  Through either method, though, "[i]t is not

enough for a plaintiff merely to impugn the veracity of the employer's justification; he must

'elucidate specific facts which would enable a jury to find that the reason given is not only a sham,

but a sham intended to cover up the employer's real motive...[ ] discrimination'" Mesnick, 950 F.2d

at 824 (citing Medina-Munoz, 896 F.2d at 8).

"Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Caesar v. Shinseki, 887 F. Supp. 2d 289, 298 (D. Mass. 2012) (internal quotations omitted).  In evaluating the competing arguments advanced by the parties, the First Circuit has instructed that "courts should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 54 (1st Cir. 2000).

### 1.      Miscellaneous Evidence of Pretext

Merrill Lynch asserts that Plaintiff's "poor performance [ ] was directly and negatively impact[ing its] clients." (Document No. 72-1, p. 12).  It cites Plaintiff's low Quality Assurance Scores, creation of call escalations and failure to utilize resources to resolve client issues as the reasons for the issuance of the two written warnings to Plaintiff and for his ultimate termination. Id.  Plaintiff argues that the written record does not support Merrill Lynch's proffered reason for termination.

Plaintiff cites numerous examples where the written record does not match up with Merrill Lynch's claims that Plaintiff was a business risk and a poor performer.  For example, at the end of 2007, when Merrill Lynch asserts Plaintiff's performance was fundamentally flawed and declining, his year-end review, written by his supervisor Mr. Kelly, characterized Plaintiff as "too new to rate." Moreover, Plaintiff points out that Merrill Lynch failed to submit any objective evidence at all of call escalations taking place, whether in the form of an email between supervisors discussing Plaintiff's performance, through a recording of the call or through the IRIS notes, which are required

entries made following each Investment Specialist's phone call and contain information regarding key points in the call, as well as date and time stamps.  The IRIS notes would indicate if a call escalation had taken place, and are not subject to Merrill Lynch's ninety-day destruction policy regarding call recordings.  Plaintiff also cites the fact that Mr. Misiano and Mr. Kelly never exchanged an email concerning Plaintiff's allegedly poor performance, and Mr. Misiano never listened to a phone call handled by Plaintiff.  (Document No. 83, p. 5).

Plaintiff also points out that despite being characterized as a "poor performer," he received a bonus for his performance in the first quarter of 2008 under the Incentive Plan.  Although he technically qualified for the performance bonus, the terms of the Plan allowed Merrill Lynch to reduce or eliminate Plaintiff's eligibility for the bonus if "management determines a participant has not fulfilled all performance or compliance obligations...." Id. p. 7.  It did not exercise that option, and Plaintiff was rewarded with a $500.00 quarterly bonus.  Plaintiff also introduced into evidence the testimony of Mr. Cahir that Plaintiff had a "very heavy accent." (Document No. 75-3, ¶ 695). Plaintiff also testified regarding the questions he received about being a terrorist because of his Muslim faith, as well as several requests he received to be transferred to someone who spoke "American English." Id. ¶ 248.  Plaintiff asserts that each of these facts and discrepancies support the existence of material factual disputes that must be decided by a jury because it demonstrates the "decision makers' intent and true state of mind during the first and second quarters of 2008." Id.

Taken in the light most favorable to him, Plaintiff's evidence sufficiently reveals inconsistencies in Merrill Lynch's reasons for terminating him to create a trialworthy issue of pretext.  Since Defendants' argument is based substantially on Mr. Kelly's testimony and his subjective opinions as to Plaintiff's work performance, Mr. Kelly's credibility is central to this case.

Thus, as a practical matter, this Court, applying Rule 56, must determine if Mr. Kelly's testimony and subjective opinions are sufficiently supported by objective data or otherwise uncontroverted such that they could support the entry of summary judgment in favor of Defendants. They are not. For instance, a reasonable juror might find an inconsistency between Plaintiff's objective eligibility for an incentive bonus for the first quarter of 2008 and the "alarmingly" poor work performance reported by Mr. Kelly. A reasonable juror may also question the rationale for the decision to require Plaintiff to "immediately" improve his Quality Assurance Scores to meet the Investment Center average[4] at the time (87.49%) when this standard was not uniformly applied, published[5] or consistent with the Quality Assurance Standard (70%) necessary to be included in the "stack ranking" for incentive compensation purposes. A reasonable juror may further question why Plaintiff went from a first warning to a final warning in two weeks and to his termination two weeks later when his Quality Assurance Average was steadily improving. While Defendants may ultimately prevail at trial, it is not permissible for this Court to make such credibility determinations in this Rule 56 context. The Court agrees with Plaintiff that, at this stage, he has set forth sufficient facts from which a reasonable jury could find that Merrill Lynch's asserted reason for his termination was a pretext for discrimination. Accordingly, based on the evidence outlined above, the Court recommends that Defendants' Motion for Summary Judgment be DENIED.

**2.    Comparative Evidence of Pretext**

---

[4] As noted by Magistrate Judge Martin in a prior ruling in this case, "it is mathematically quite difficult for everyone in a group to achieve at least the average score of their group." Mayale-Eke v. Merrill Lynch, 754 F. Supp. 2d 372, 383 n.10 (D.R.I. 2010). In fact, other than in fictional Lake Wobegon, where everyone is above average, it is difficult to have a group of mostly above average performers unless the abilities of the group as a whole are very highly skewed. Moreover, if an average score was necessary to continue employment, then a good portion of the workforce should be on final warning.

[5] See Trainor v. HEI Hospitality, LLC, 699 F.3d 19, 28-29 (1st Cir. 2012) (holding that the absence of documentation of a policy is a factor that a jury reasonably could consider in deciding an issue of motive).

Despite recommending that the Motion be denied based on the evidence outlined above, the Court will also consider the parties' dispute regarding comparator evidence of pretext.  In order to prove pretext on the basis of comparative evidence, a plaintiff must show "that others similarly situated to him in all relevant respects were treated differently by the employer." Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir. 1999). "It is fundamental that '[a] claim of disparate treatment based on comparative evidence must rest on proof that the proposed analogue is similarly situated in all material respects.'" Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 21 (1st Cir. 1999) (quoting Perkins v. Brigham & Women's Hosp., 78 F.3d 747, 751 (1st Cir. 1996)).  "While there is no exhaustive list of relevant factors, in general terms a plaintiff must show purported comparators 'have dealt with the same supervisor, been subject to the same standards and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or [their employers'] treatment of them for it.'" Sellers v. U.S. Dep't of Def., 654 F. Supp. 2d 61, 67 (D.R.I. 2009) (citing Walker v. Ohio Dep't of Rehab. & Corr., 241 Fed. Appx. 261, 266 (6th Cir. 2007)).  It is Plaintiff's burden to demonstrate that the proposed comparators are similarly situated.  Dartmouth Review v. Dartmouth Coll., 889 F.2d 13, 19 (1st Cir.1989).

"The examples of disparate treatment 'need not be perfect replicas, [but] they must closely resemble one another in respect to relevant facts and circumstances.'" Kosereis, 331 F.3d at 214 (citing Conward, 171 F.3d at 20).  The First Circuit has held that the test is whether a "prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated." Dartmouth Review, 889 F.2d at 19.

In the present case, the parties have opposing views of the relevant group of Investment Specialists who are potential comparators.  Merrill Lynch takes the position that a suitable comparator for Plaintiff must have "reported to Kelly...provided poor customer service and created customer dissatisfaction as reflected in (1) consistently low average Quality Assurance Scores, (2) call escalations on a highly frequent basis...and (3) failure to utilize available resources." (Document No. 75-2, p. 5).  Plaintiff, on the other hand, contends that "[t]he correct comparators to Mr. Mayale-Eke are investment specialists in the Lincoln Investment Center but not in Mr. Mayale-Eke's protected class(es) who earned average to below average scores under the Incentive Plan." Id. p. 7.

In support of his position, Plaintiff contends that it is fair to compare all Investment Specialists at the Investment Center to Plaintiff for several reasons.  First, Plaintiff points out that the comparators do not have to correlate exactly under the applicable law, and that whether the comparators do sufficiently correlate is a question for a factfinder.  (Document No. 75, p. 5). Plaintiff also takes issue with Merrill Lynch's assertion that call escalations should be included in the potential field of comparators, since there is no data regarding which Investment Specialists might have created call escalations.  Plaintiff also alleges that the identity of the supervisor of the Investment Specialist is not conclusive since Merrill Lynch had a policy of "consistent practices" and an Investment Center-wide Incentive Plan.  Id. p. 6.  Plaintiff argues that Chad LaCroix, the most senior Merrill Lynch Executive at the Lincoln Center, was ultimately responsible for terminating Plaintiff and the decision to "discipline and/or fire all investment specialists...[was] subject to the [ ] same decisionmaker, Mr. LaCroix." Id. p. 7.

Merrill Lynch, on the other hand, points out that Plaintiff cannot even establish the national origin or religion of other Investment Specialists, and therefore has not proven who was within his protected class. (Document No. 78, p. 21). Merrill Lynch also alleges that its disciplinary process is "flexible, such that the level of discipline administered and the time given to improve performance depends on, among other things, the type of performance deficiency and the impact of the performance deficiency has on [Merrill Lynch's] business." Id. p. 22. Defendants also claim that Plaintiff should not be permitted to exclude Investment Specialists who have caused call escalations. Defendants conclude that there is no basis to broaden the "potential comparator field to include all investment specialist[s] at the Investment Center who had average to below average scores under the Incentive Plan." Id.

The parties have been before this Court on discovery disputes concerning Defendants' production of documents showing Investment Specialists' national origin. (See Documents Nos. 79, 80). Despite Plaintiff's claim that Merrill Lynch has failed to produce records, Plaintiff also asserts that he has sufficient evidence to support his claim that comparators outside of his protected class were treated in a more favorable fashion. (See Document No. 83, pp. 9-13). Even affording Plaintiff the indulgences required under Rule 56, the proposed comparators suffer from the same deficiencies pointed out by Defendants – namely, they had different supervisors, different tenures at Merrill Lynch, and a different history of call escalations and discipline. In short, there are too many moving parts to consider, when trying to compare Plaintiff to other Investment Specialists in the Rule 56 context. At the same time, however, there is some merit in Plaintiff's argument that the Investment Center had a policy of consistent practices and that Mr. LaCroix held the ultimate managerial authority regarding the termination of Investment Specialists. Weighing the competing

arguments, however, neither party has made a persuasive showing, and the differences between the proposed comparators and Plaintiff outweigh the similarities on the record presented.  Therefore, for purposes of this Motion for Summary Judgment, the recommendation that Defendant's Motion be denied is not based upon the use of comparator evidence.[6]

**Conclusion**

For the foregoing reasons, I recommend that Defendants' Motion for Summary Judgment (Document No. 72) be DENIED.  Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within fourteen (14) days of its receipt.  See Fed. R. Civ. P. 72(b); LR Cv 72.  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the District Court and the right to appeal the District Court's decision.  See United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


   /s/   Lincoln D. Almond
LINCOLN D. ALMOND
United States Magistrate Judge
September 9, 2013

---

[6] This recommendation is based on the presentations made in connection with this pending Motion and is not intended to address the ultimate admissibility of comparator evidence at trial.